**BEFORE THE JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE 1-800 CONTACTS<br>ANTITRUST LITIGATION | )<br>) | MDL Docket No. 2770 |

# REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER AND COORDINATION OF RELATED ACTIONS PURSUANT TO 28 U.S.C. § 1407

Pursuant to 28 U.S.C. § 1407 and the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiffs Daniel Bartolucci and Edward Ungvarsky ("Plaintiffs") submit this Reply Memorandum in support of their motion to transfer all related cases, and any subsequently filed cases, to the United States District Court for the District of Columbia.

## INTRODUCTION

All Plaintiffs and Defendant 1-800 Contacts ("1-800") agree the six cases covered by Plaintiffs' opening memorandum should be consolidated because they contain substantially identical claims. The relevant factors favor consolidating the cases through the MDL process, and transferring them to the United States District Court for the District of Columbia. The Plaintiffs in the other five cases filed to date have all joined in requesting transfer to D.C., and Defendant Vision Direct did not file a response and has not opposed consolidation in the District of Columbia. *See* D.E. 20-21, 23-24; Exh. A.

1-800 argues the cases should be transferred under 28 U.S.C. 1404 to the District of Utah, where it has its headquarters, rather than consolidated through the MDL process. However, its arguments in favor of section 1404 as the procedural mechanism for consolidation, and in favor of Utah as the forum, are based on profound misunderstandings or mischaracterizations about the nature of Plaintiffs' claims and the MDL process—and should be rejected.

## BACKGROUND

Like the FTC, Plaintiffs have asserted antitrust claims based on written ***agreements*** between 1-800 and 14 of its direct competitors, which Plaintiffs and the FTC contend have suppressed competition in certain online search advertising auctions and restricted truthful and non-misleading internet advertising to consumers. Each of the Plaintiffs' pleadings cites the FTC's complaint and relies heavily on the FTC's allegations regarding 1-800's conduct.

In the ongoing FTC proceeding in the District of Columbia, 1-800 attempted to recharacterize the claims against it as based on its *litigation* activities (which 1-800 contends are immune from liability)—rather than based on the web of ***agreements*** between 1-800 and its competitors. The FTC, however, recently rejected that attempted recharacterization, explaining its complaint "only challenges private agreements," and granting a Motion for Partial Summary Decision against 1-800 with respect to its Second Defense.[1]

1-800 is attempting the same sleight of hand here, repeatedly but suggesting that Plaintiffs' antitrust challenge is based on underlying trademark litigation between 1-800 and its direct competitors.[2] That is flat wrong. Plaintiffs' claims are based on the private ***agreements*** between 1-800 and its 14 direct competitors located across the United States.

---

[1] *1-800 Contacts, Inc.*, File No. 141-0200, Commission Opinion and Order Granting Motion for Partial Summary Decision at 5 (F.T.C. Feb. 1, 2017), attached as Exh. B. 1-800's Second Defense is that "the lawsuits that gave rise to the trademark settlement agreements described in the Complaint have not been alleged to be and have not been shown to be objectively and subjectively unreasonable." The FTC also granted a partial summary decision on 1-800's Third Defense, that the *Noerr-Pennington* doctrine and the First Amendment immunize non-sham petitioning from antitrust liability, because the complaint "alleges liability based only on private agreements that do not constitute government petitioning." *Id.*

[2] *See, e.g.*, D.E. 22 at 1 (class "challenges as anticompetitive trademark litigation filed by 1-800Contacts in Utah . . . ."); *id.* at 2 ("similar antitrust claims challenging 1-800 Contacts' assertion of these same trademark rights"); *id.* at 3 ("underlying trademark actions"); *id.* at 4 ("The gravamen of these antitrust cases is that 14 or more trademark litigations . . . were allegedly anticompetitive."); *id.* at 5 ("The central allegation of the complaints is that 1-800 Contacts' assertion of its trademark rights were baseless and anticompetitive"); *id.* at 16 ("Plaintiffs here challenge the merits of 1-800 Contacts' trademark litigation in the District of Utah.").

## ARGUMENT

### I. CONSOLIDATION UNDER 1407 IS THE PREFERRED PROCEDURE HERE

At present there are six substantially similar cases pending in three different jurisdictions—and the possibility that additional cases will be filed. Plaintiffs in the four cases pending in the District of Columbia and Eastern District of Pennsylvania oppose transfer to Utah under section 1404. 1-800 nevertheless asks the Panel to deny consolidation and transfer pursuant to section 1407. However, its arguments are based on mischaracterizations of Plaintiffs' actions, misconceptions about MDL procedures, and are otherwise unavailing. The six pending cases—and any future cases filed, including those which may follow an adverse ruling against 1-800 in the FTC proceeding, scheduled for trial on April 11, 2017—should be transferred to the United States District Court for the District of Columbia, pursuant to section 1407.

1-800's argument that these actions should be transferred to Utah is based on its self-serving contention that Plaintiffs' cases arise from its earlier trademark litigation in Utah, *see* D.E. 22 at 1-5, & 16, and its suggestions that the majority of the witnesses will be located in Utah, *see* D.E. 22 at 9-10. Both the Commission's ruling in the FTC action on 1-800's affirmative defenses and the publicly available information regarding the location of witnesses in that action suggest otherwise. *See* Exh. B at 5 and *infra* at 7-9.

1-800 argues against centralization of these actions though the MDL process, claiming consolidation under section 1404 is preferable because it is for all purposes. D.E. 22 at 1-2, 7, 11-12. However, that argument always weighs in favor of consolidation under section 1404, and, by implication, would almost always favor consolidation in Defendant's home jurisdiction.

1-800 also claims that use of 1407 supposedly would create "a real risk that the cases would return to three different courts for at least three different trials of the same claims." D.E.

22 at 12. That is nonsense—which is evident from the fact that **1-800 has not identified a single instance in which transfer under 1407 has been followed by multiple class action trial of the "same claims."** Indeed, 1-800's novel argument cuts against centralizing any class actions under section 1407.

Contrary to 1-800's contention, when class actions are transferred under 1407, a consolidated amended complaint often is filed in the transferee court.[3] If, after pretrial proceedings, the claims of a certified class are ready for trial, the trial can take place in the transferee court (if a class action was originally filed in that court, or the parties consent), or the class action can be transferred back to the original transferor court for trial. *See* Manual for Complex Litigation, Fourth, § 20.132 at 224 ("while remaining faithful to *Lexecon* limitations" transferee court may conduct trial of "actions originally filed in the transferee court").

1-800 is also incorrect when insisting—without citation to any authority (D.E. 22 at 3-4, 13-15)—it would be improper for a plaintiff to voluntarily dismiss an action transferred under 1407 and refile its claims in the transferee court if the transferee court is a proper venue. *See* Manual for Complex Litigation, *id*. at 224 ("Soon after transfer, the plaintiffs in an action transferred for pretrial from another district may seek or be encouraged (1) to dismiss their action and refile the action in the transferee district" or "(2) to file an amended complaint asserting venue in the transferee district"); *The Workings of the U.S. Judicial Panel on Multidistrict Litigation and the Selection of the Transferee Court* at 42[4] ("Plaintiff can dismiss action

---

[3] http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/2012_jointcle_materials1/7_4_Ten_Steps_to_Better_Case_Management.authcheckdam.pdf at 8, attached as Exh. C.

[4] http://www.jpml.uscourts.gov/sites/jpml/files/Tulane%20Law%20Symposium%20Presentation.pdf, attached as Exh. D.

transferred under 1407 and refile in transferee district (assuming proper venue)").[5] In any event, most cases centralized through the MDL process are resolved through motions practice or settlement, and less than 2.8% of pretrial consolidated cases are remanded to the original forum for trial.[6] **Thus, 1-800 is simply wrong when it insists that utilization of section 1407 here would result in multiple trials of the same class actions.**[7]

Under 1-800's view, the Panel should not grant Plaintiffs' 1407 motion until two separate district court's decide contested motions for transfer under section 1404. But the Panel regularly consolidates cases under section 1407, even when section 1404 motions are pending, for multiple reasons which apply here. First, there are four cases outside of Utah, and no guarantee the judges in those actions will transfer them to Utah over plaintiffs' objections.[8] Most of the cases cited by 1-800 involved parties who consented to transfers under section 1404,[9] or where the

---

[5] 1-800 submitted a declaration in support of its response to the Motion. D.E. 22-1. That declaration misrepresents statements 1-800 has attributed to counsel for the Bartolucci Plaintiffs. *See* Exh. E. But the declaration has no legal relevance to the pending Motion and should be disregarded for that reason.

[6] U.S. J.P.M.L. Statistical Analysis Cumulative from 1968-2015. http://www.jpml.uscourts.gov/sites/jpml/files/JPML_Statistical_Analysis_of_Multidistrict_Litigation-FY-2015_0.pdf.

[7] 1-800's reliance on the first-filed doctrine is also misplaced. D.E. at 14. That doctrine applies when separate plaintiffs disagree about which of their respective cases should move ahead. Here, in contrast, all plaintiffs ***agree*** about how and where to proceed—and the plaintiff in the first-filed case, Stillings, has expressly requested transfer to D.C. under section 1407. *See* D.E. 24.

[8] The two cases in Utah remain before separate judges, with a hearing on a motion to consolidate them scheduled for March 15, 2017. *Stillings* is before Judge Stewart and *Thompson* before Judge Campbell. *See* 2:16-cv-01257-TS; 2:16-cv-01183-TC Dkt. No. 53.

[9] *See In re: Waggin' Train Chicken Jerky Pet Treat Prods. Liab. Litig.*, 893 F.Supp.2d 1357,1358 (J.P.M.L.2012) (section 1404(a) motion was unopposed); *In re: Best Buy Co., Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011) ("all responding parties represented that they were amenable to Section 1404(a) transfer in the absence of Section 1407 centralization."). Here, counsel in the cases pending outside Utah adamantly oppose transfer to Utah. *See In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1381 & n. 4 (J.P.M.L. 2013) ("Other recent decisions in which we denied centralization in favor of Section 1404 motions have involved fewer districts than here and/or indications from counsel that they were amenable to Section 1404 transfer.").

majority of the cases had already been transferred to a single jurisdiction.[10] Second, the MDL process is far better able to address later-filed cases. Two of the six related cases were filed in mid-January, and the FTC case against 1-800 is scheduled for trial commencing on April 11, 2017. D.E. at 19. If the Commission finds that 1-800 violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, there could be additional actions filed.[11] Third, centralization of these cases now under section 1407 does not preclude transfer of these cases later under section 1404, if appropriate. *See Cooper v. Family Dollar Stores, Inc.*, No. C.A.09-1874 JEI/AMD, 2009 WL 2132424, at *2 (D.N.J. July 14, 2009) (proper for defendant renew its motion for transfer once pretrial proceedings are concluded); *In re SFBC Int'l, Inc., Sec. & Derivative Litig.*, 435 F.Supp.2d 1355, 1356 (J.P.M.L. 2006) ("Should trial become necessary in any of the transferred actions, the question of transfer under Section 1404 can, of course, be revisited by the transferor judge when the action is remanded to the transferor court after completion of Section 1407 pretrial proceedings."). If the MDL Motion is granted not only may Defendant's 1404 motion be renewed after competition of pretrial proceedings, but at that point there will be additional information available to the transferor courts shedding light on which venue is best for trial.

## II. THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA IS THE MOST CONVENIENT FORUM FOR COORDINATION

[10] *See, e.g., In re: Michaels Stores, Inc., Pin Pad Litig.*, 844 F. Supp. 2d 1368, 1368 (J.P.M.L. 2012) (six of the seven actions had already been consolidated and therefore all cases were pending only in two districts).

[11] *In re Oxycontin Antitrust Litig.*, 314 F. Supp. 2d 1388, 1390 (J.P.M.L. 2004) ("Given that the number of related actions continues to grow, along with the potential need for additional motions to transfer venue, we find that transfer under Section 1407 is warranted. We observe that transfer under Section 1407 has the salutary effect of placing all actions in this docket before a single judge who can formulate a pretrial program"); *see also In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1381 (J.P.M.L. 2013) (granting consolidation under 1407 despite argument that "Section 1404 transfer is the preferable course for this litigation because it is a transfer for all purposes").

As Plaintiffs explained in their Motion for Transfer, the United States District Court for the District of Columbia is the most appropriate forum for the Related Actions because: (1) the related administrative action brought by the FTC against 1-800 is pending in the District of Columbia; (2) D.C. is a convenient location for the majority of the witnesses; (3) the majority of Plaintiffs are located in D.C. or close proximity to it; (4) the District Court for the District of Columbia has considerable experience with antitrust law and litigation and with MDL proceedings; and (5) the District Court for the District of Columbia has favorable docket conditions, permitting efficient and timely litigation.

**A. 1-800 Overstates The Relevance of Events and Witnesses In Utah**

1. **1-800 is dismissive of the role of plaintiffs in these cases**

These cases concern a series of agreements between 1-800 and its competitors (including Defendant Vision Direct) that Plaintiffs contend raised the prices of contact lenses in D.C. (where Plaintiffs Bartolucci and Ungvarsky reside), and elsewhere in the United States. If Plaintiffs' allegations are proven, 1-800 and its competitors violated the antitrust laws and injured Plaintiffs and other class members who purchased contact lenses. 1-800 insists the forum in which the victims of the alleged anticompetitive conduct made their purchases has "no connection whatsoever" to the cases.[12] This is a remarkable proposition—and if it were true, the federal court for the District of Columbia would lack jurisdiction over Plaintiffs' case. But it is untrue—and 1-800 has not alleged a lack of jurisdiction. The victims of the alleged conduct should not regarded by 1-800 as bit players.[13] That a majority of the Plaintiffs and their counsel reside on the East Coast (and none in Utah) weighs in favor of D.C. as a transferee forum here.

[12] *See* D.E. at 3; *see also* id. at 3 ("none" of the "potential witnesses" reside in DC); *id*. at 10 ("No significant events at issue took place in Washington, D.C.").

[13] 1-800 suggests the location of the plaintiff (and his injury) "should carry little weight in a putative national class action" (D.E. at 17), but cites no authority other than a 1947 decision which predates both

### 2. 1-800 downplays the importance of discovery and testimony from its competitors with whom it entered into the challenged agreements, and from other third-parties

These cases challenge a series of 14 agreements between 1-800 and its competitors. One of those competitors, Vision Direct, is already a defendant in two of the underlying cases. Other competitors will either be added as defendants after consolidation, or will be important sources of third-party discovery. Only one of 1-800's competitors is located in Utah, while the other 13 are headquartered in a variety of locations across the United States. D.E. 22 at 10. And even defendant Vision Direct, headquartered in Washington State (*id*.), has not opposed Plaintiffs' motion for consolidation in the District of Columbia. *See* Exh. A. 1-800 also ignores the need for discovery from the companies that provide the online advertising services affected by the agreements—none of which appear to be located in Utah. Although 1-800 suggests that discovery in these matters will center on Utah-based documents and testimony, in the FTC proceedings both the FTC and 1-800 built their respective cases, in large part, on evidence held and witnesses residing ***outside*** of Utah. The FTC and 1-800 served subpoenas on multiple market participants, including counterparties to the agreements at issue, seeking evidence about the nature and extent of competition in the alleged relevant markets. In justifying its subpoena to WebEyeCare, a Pennsylvania-based contact lens retailer, 1-800 explained that "efforts to obtain market-related information from third-party participants in [the affected] markets are not just commonplace in antitrust cases; they can be essential." Exh. F, 1-800 Contacts' Mem. Opp. to Non-Party WebEyeCare's Motion to Quash, at 3; *id.* at 3-4 (noting that the FTC intends to introduce trial testimony from a current or former employee of WebEyeCare); Ex. G, Order on

---

Rule 23 and section 1407. In a nationwide class action plaintiff's choice of forum is still "entitled to some weight and it weighs against transfer." *Luchini v. CarMax, Inc.*, No. 1:12CV0417 LJO DLB, 2012 WL 2401530, at *4 (E.D. Cal. June 25, 2012).

Respondent's Motion For Issuance of a Subpoena Under Rule 3.36 at 2 (describing 1-800's subpoena to the FTC, which sought, *inter alia*, documents concerning competitive conditions in the market for contact lenses). This kind of evidence is likely to play a similarly significant role in this matter.

### 3. 1-800's misapprehension of the allegations leads it to overstate the relevance of Utah

While failing to recognize the importance of Plaintiffs and discovery from many third-parties, 1-800's misapprehension of Plaintiffs' allegations have led it to dramatically overstate the relevance of Utah. *See supra* at 2 n. 2. Plaintiffs are not asserting claims predicated on 1-800's litigation activities. Like the FTC's claims, Plaintiffs' claims are based on 1-800's ***private agreements*** with competitors. Therefore, 1-800's prior trademark litigation against its competitors, as the Commission held in granting a partial summary decision on two of 1-800's affirmative defenses, is actually of no legal relevance.[14]

Moreover, even with 1-800's mischaracterization of Plaintiffs' claims, 1-800 can only assert that a *plurality* of the witnesses are located in Utah. D.E. 22 at 17. Thus, even before accounting for 1-800's focus on irrelevant litigation activities in Utah, it recognizes that many witnesses, if not a majority, will be located ***outside*** Utah.[15]

---

[14] 1-800 appears engaged in forum shopping within Utah by suggesting there would be efficiency in having the two Utah cases consolidated before Judge Stewart, contrary to the local rules which assign consolidated cases to the Judge with the first-filed case (here, Judge Campbell). *See* D.E. 22 at Ex 14 at 8 (Judge Stewart "previously has considered an issue presented by both Related Actions: whether 1-800 Contacts' enforcement of its trademark rights regarding the use of its trademarks to purchase search engine advertising that culminated in the settlements here was baseless," and suggesting that therefore "consolidation before Judge Stewart might maximize judicial efficiency").

[15] Although most details regarding fact discovery in the FTC proceeding are not public, 1-800's JPML filing appears to acknowledge that most of the fact depositions taken were conducted *outside* Utah. D.E. 22 at 19 (noting 13 depositions in Utah were "more than in any other location"—not that most depositions occurred in Utah). Moreover, none of the depositions of 1-800's experts were scheduled to occur in Utah—and two of those depositions were set by 1-800 to occur in Washington, DC. 1-800 Contacts, Inc.,

### B. The District Court for the District of Columbia has Considerable and Valuable Experience in Antitrust Law and MDL Proceedings

1-800 does not dispute the District Court for the District of Columbia has substantially greater experience with antitrust litigation and multidistrict litigation than the District of Utah. Nor does 1-800 disagree that Judge Amy Berman Jackson, to whom the two D.C. cases were assigned, is an experienced jurist with significant antitrust experience. In fact, she recently presided over a lengthy and complicated antitrust trial in *United States of America, et al. Anthem, Inc. and Cigna Corp.,* Case 1:16-cv-01493. D.C. is also the site of the related FTC action, which weighs in favor of centralizing these cases in D.C. *See In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1274 (J.P.M.L. 1975) ("pendency of a related government action in a particular district is an important factor in selecting the transferee forum").

In contrast, 1-800 makes no affirmative case for the District of Utah's experience with complex antitrust matters or MDLs—instead suggesting its relative lack of experience with those kinds of matters means it "has more capacity for MDL proceedings." D.E. at 18.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' Motion, Plaintiffs respectfully request that the Motion be granted and that the actions on Schedule A, as well as any tag-along actions, be transferred pursuant to 28 U.S.C. § 1407 to the United States District Court for the District of Columbia, and be assigned to the Honorable Amy Berman Jackson.

DATED: February 22, 2017

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Carl E. Goldfarb
Carl E. Goldfarb

---

File No. 141-0200, Complaint Counsel's Motion And Memorandum In Support To Limit Respondents To Five (5) Expert Witnesses at 21 (F.T.C. Feb. 4, 2017), attached as Exh. H.

Boies, Schiller & Flexner LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Tel. (954) 356-0011
Fax (954) 356-0022

William A. Isaacson
Scott E. Gant
Boies, Schiller & Flexner LLP
1401 New York Ave., NW
Washington, DC 20005
Tel. (202) 237-2727
Fax (202) 237-6131

*Attorneys for Plaintiffs*
*Daniel Bartolucci and Edward Ungvarsky*